UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

In Re:                                                    )
                                                          )
PRESIDENT CASINOS, INC., et al.,      )    Case No. 02-53005-659
                                                          )    Chapter 11
                                                          )
                    Debtors.                        )

**O R D E R**

The matter before the Court is the First Omnibus Objection to Claims Filed Against President Riverboat Casino-Missouri, Inc. (Non-Personal Injury Claims), Joint Stipulation of Facts Relative to James Zweifel's Claim Against President Riverboat Casino-Missouri Inc. (the "Joint Stipulation"), Memorandum of Law in Support of James Zweifel's Claim Against President Riverboat Casino-Missouri, Inc., Debtor's Brief in Support of Objection to Claim of James Zweifel Against President Riverboat Casino-Missouri, Inc., Memorandum of Law in Reply to Debtor's Brief in Support of its Objection to Claim of James Zweifel Against President Riverboat Casino-Missouri, Inc., and Debtor's Reply Brief in Support of Objection to Claim of James Zweifel Against President Riverboat Casino-Missouri, Inc.  A hearing in this matter was held on March 14, 2007, where each party appeared by counsel and James Zwiefel appeared in person.

President Casinos, Inc. ("PCI") is the sole shareholder and parent company of President Riverboat Casino-Missouri, Inc. ("PRC-MO").  PRC-MO owned and operated a riverboat gaming casino aboard the *Admiral* on Laclede's Landing in St. Louis, Missouri (the "Admiral Casino").  Joint Stipulation ¶ 1.  PCI is also the sole shareholder and parent company of PRC Management, Inc. ("PRC Management").  Joint Stipulation ¶ 2.  PCI and PRC-MO filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on June 20, 2002, and PRC Management filed a voluntary petition for relief under Chapter 11 on July 11, 2002.  Joint Stipulation ¶ 5.

PRC Management maintained the responsibility of paying the expenses of the PCI

corporate office including compensation and bonuses paid to PCI's corporate officers.  Joint Stipulation ¶ 6.  PRC Management also handled numerous administrative matters for PCI's various subsidiary casino operations and billed each of the subsidiaries for their allocated share, including but not limited to, insurance coverage, employee benefit programs, 401(k) administration and tax filing, preparation of state and federal income tax returns, and regulatory reporting to governmental agencies.  Joint Stipulation ¶ 7.  PRC Management's only source of revenue for the payment of expenses has been from funds generated by PCI's subsidiaries.  Recently, such funding came solely from PRC-MO, until the sale of PRC-MO to Pinnacle Entertainment, Inc. which closed on December 20, 2006.  Joint Stipulation ¶ 8.

James Zweifel ("Zweifel") executed an employment agreement with PCI on November 1, 1995 (the "Employment Agreement") whereby he assumed the title of Vice President and Chief Financial Officer of PCI.  Under the terms of the Employment Agreement, Zweifel was provided with the "overall responsibility for [PCI's] financial affairs" and was to "work directly with the senior officers of [PCI] in formulating [PCI's] financial plan."  Joint Stipulation ¶ 9.  Between November 1995 and July 1997, Zweifel was Vice President and Chief Financial Officer of PCI.  During this period, Zweifel's compensation and fringe benefits were paid by and were treated as expenses of PRC Management.  Joint Stipulation ¶ 10.

In July of 1997, Zweifel was promoted to Executive Vice President and Chief Financial Officer of PCI and he held that position until September 2000.  During this period, all of Zweifel's compensation and fringe benefits were paid by and were treated as expenses of PRC Management. Joint Stipulation ¶ 11.  Zweifel and PCI entered into an "Amended and Restated Employment Agreement" (the "Amended Employment Agreement") on June 26, 1998.  Zweifel's duties were not materially altered by the Amended Employment Agreement.  Joint Stipulation ¶ 12.  During the period between November 1995 and September 2000, Zweifel maintained his office at PCI's headquarters while working closely with PCI's other top executives in the management of PCI.

During this time, Zweifel regularly prepared the agenda for and attended PCI board meetings. Joint Stipulation ¶ 13.

Zweifel's Amended Employment Agreement with PCI was further amended by the terms of a letter agreement dated September 26, 2000 (the "Letter Agreement"). Pursuant to the Letter Agreement, Zweifel gave up the title and duties of Chief Financial Officer of PCI and assumed the title of Vice President and General Manager of PRC-MO and the responsibilities of "those of Vice President General Manager of our St. Louis operation, President Riverboat Casino-Missouri, Inc." Zweifel, however, retained the title of Executive Vice President of PCI. Joint Stipulation ¶ 14. Zweifel was paid his last bonus from PRC Management in October 2000. This bonus was based upon the overall performance of PCI's three casino subsidiaries from June 2000 to August 2000 during a period which Zweifel was serving as Chief Financial Officer of PCI. Joint Stipulation ¶ 15.

Zweifel remained in the capacity of Vice President-General Manager of PRC-MO from September 26, 2000 until June 11, 2002. Joint Stipulation ¶ 16. During the period between September 26, 2000, and June 11, 2002, Zweifel's sole and exclusive responsibility was as Vice President and General Manager of PRC-MO. While Zweifel retained the title of Executive Vice President of PCI, he was not invited to attend regular board meetings of PCI, nor did he utilize an office at PCI headquarters or otherwise perform functions as a PCI employee. Joint Stipulation ¶ 17.

During his tenure as General Manager of PRC-MO, Zweifel maintained his office at the Admiral Casino and oversaw the day-to-day management of PRC-MO's business operations. Zweifel received his regular paychecks from PRC-MO except for the period between October 2000 and December 2000 when he continued to receive his paychecks from PRC Management. Zweifel received a bonus in the amount of $70,500.00 for PRC-MO's fiscal year ending February 28, 2002, which was paid by PRC-MO. The bonus was based exclusively upon the financial performance the Admiral Casino. Zweifel's travel and entertainment expenses were also paid by PRC-MO. Joint

3

Stipulation ¶ 17.

Employment tax filings, as well as social security tax filings made by PRC-MO while Zweifel was its Vice President and General Manager indicated that he was an employee. The Form 10-K filings with the United States Securities and Exchange Commission made by PCI for the fiscal years ending February 28, 2001, and February 28, 2002, indicate that:

> Mr. Zweifel has been Executive Vice President and General Manager of the Company's St. Louis operations since September 2000. Mr. Zweifel was Executive Vice President and Chief Financial Officer of the Company from July 1997 until September 2000. Mr. Zweifel served as Vice President and Chief Financial Officer from November 1995 until July 1997.

Neither of these 10K filings make reference to Zweifel's title as an officer of PCI nor to any duties that he was performing for PCI. In the Definitive Proxy Statement filed by PCI on June 28, 2001, PCI stated that "[i]n September 2000, the Company amended Mr. Zweifel's Amended and Restated Employment Agreement whereby his responsibilities became those of Vice President-General Manager of the St. Louis operations." No reference was made in the Definitive Proxy Statement regarding Zweifel's status as an Executive Vice President of PCI nor is there any reference to any duties that Zweifel was performing for PCI. Joint Stipulation ¶ 17.

The Form W-2 Wage and Tax Statements received by Zweifel for the years 2001 and 2002 both list PRC-MO as his employer. Joint Stipulation ¶ 17. Zweifel received a notice of termination of his employment from PCI on June 11, 2002. The notice of termination states that Zweifel's employment is being terminated as of June 11, 2002, "without cause." Joint Stipulation ¶ 18. Zweifel's final paycheck in the sum of $19,884.62, which reflected unpaid salary, as well as accrued vacation, was paid by PRC-MO. Joint Stipulation ¶ 19. By the terms of Section 4.1 of the Amended Employment Agreement, Zweifel was entitled to certain benefits defined as "Accrued Obligations," "Annual Base Salary Continuation," "Welfare Benefit Continuation," and "Other Benefits." Joint Stipulation ¶ 20.

4

At the time PCI and its subsidiary companies filed for bankruptcy protection, Zweifel had not received the benefits he was entitled to under Section 4.1 of the Amended Employment Agreement nor has he received those benefits to date. Joint Stipulation ¶ 21. Zweifel has benefits due to him under Section 4.1 of the Amended Employment Agreement which total $338,937.00. Joint Stipulation ¶ 22. Zweifel filed identical proofs of claim in the bankruptcy proceedings of PCI, PRC Management, and PRC-MO, all of which reflect an unsecured claim in the amount of $338,937.00, of which $4,650.00 is claimed as an unsecured priority claim for wages and contributions to an employee benefit plan. Joint Stipulation ¶ 23. Since 1995, PCI paid no compensation, bonus, or severance to any of its executives with whom it has maintained employment agreements but rather those payments were made by PRC Management through funds generated by the gaming operations of PCI's subsidiary companies. Joint Stipulation ¶ 24.

Debtors argue that Zweifel has the burden of proof regarding the allowance of his claim, and that Zweifel filed multiple claims and should be allowed only one claim for the obligations under the Letter Agreement against PCI. Debtor also argues Zweifel is entitled to recover his unpaid severance from the PCI estate since the Letter Agreement was executed between Zweifel and PCI, and that there is no basis for liability for PRC-MO, so the Court should look only to the four corners of the contract. Debtor further argues that Zweifel was a sophisticated businessman who had knowledge of the separate legal existence of these companies, and that although PRC-MO compensated Zweifel for the services that he performed for PRC-MO, it was PCI, not PRC-MO, which agreed to compensate Zweifel after his services were no longer desired by PCI.

Additionally, Debtors argue that bankruptcy courts are courts of equity, but they are not entitled to completely ignore state law in determining the substance of a claim, and if the court looks beyond the contract, the court should look at other equities presented here. Zweifel was employed with PCI for five out of the seven years under the Employment Agreement and Amended Employment Agreement, so Debtors argue that PCI should be obligated to pay a pro-rata portion

5

equal to 5/7ths, and PRC-MO should therefore be obligated to pay only a pro-rata portion equal to 2/7ths since Zweifel was employed with PRC-MO for the remaining two years under the Letter Agreement. Furthermore, Debtors argue that Zweifel should not be allowed to bypass the creditors of PCI. Consequently, Debtors aver that PCI is the only Debtor responsible for the obligations under the Letter Agreement and Zweifel's claim against PCI's estate should be allowed; however, Zweifel's claims against PRC-MO should be disallowed.

     Zweifel argues that he filed identical proofs of claim in the PRC-MO, PCI, and PRC Management proceedings in an abundance of caution and understands that he can recover his severance payment from one party. Zweifel argues that the Bankruptcy Court has equitable powers to prevent a grave injustice against Zweifel. Zweifel argues that he was under a written contract with PCI, but he was also an employee of PRC-MO, that PRC-MO was listed as Zweifel's employer on his W-2 forms for the years 2001 and 2002, and that PRC-MO assumed all responsibility for paying Zweifel's salary and other benefits under the Letter Agreement. Thus, the Letter Agreement created a Zweifel/PRC-MO agreement and was treated as such until Zweifel was terminated and it was only with regard to the issues of severance pay did PRC-MO contend that only PCI was liable.

     Zweifel further argues that PRC-MO clearly assumed responsibility for payment of Zweifel's salary as well as the financial obligations set out in the Employment Agreement and at no time advised Zweifel that it was only selectively choosing to pay certain provisions of the Letter Agreement. When Zweifel was actually employed by PCI, PCI relied on PRC Management as the source of funds for the payment of Zweifel's salary. Zweifel was also paid by PRC-MO when he became an officer of PRC-MO even though he was contractually bound by agreement to PCI, which never held sufficient funds to pay Zweifel.

     Zweifel also argues that during the time that Zweifel worked at PRC-MO, PRC-MO paid Zweifel in strict accordance with the terms of the Letter Agreement. Since PRC-MO openly treated

6

Zweifel as its employee as evidenced by his W-2, this situation became much more than a simple contract claim. The absence of PRC-MO's signature from the Employment Agreement had no bearing on the implementation of that agreement by PRC-MO while Zweifel was its employee and therefore should have no bearing upon the implementation of the severance provision after the termination of Zweifel's employment by PRC-MO. Therefore, Zweifel's avers that his claim against PRC-MO should be allowed.  The Court addresses each argument and provides its decision below.

"Whether to pierce a corporate veil is a legal determination that, in our circuit, is governed by state law." *Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997).  "As a general rule, two separate corporations are to be regarded as distinct legal entities, even if the stock of one is owned partly or wholly by the other." *Mitchell v. Home Insurance Company of Illinois*, 865 S.W.2d 779, 784 (Mo. Ct. App. 1993) (*Central Cooling & Supply Co., v. Director of Revenue*, 648 S.W. 2d 546, 547-48 (Mo. 1982); *Terre Du Lac Association, Inc. v. Terre Du Lac, Inc.*, 737 S.W. 2d 206, 218 (Mo. Ct. App. 1987)).  One exception to the aforementioned doctrine occurs where a plaintiff pierces the corporate veil. *Id.*  A decision to pierce the corporate veil is a rare occurrence and Missouri courts do not take this action lightly. *Patrick v. Koepke Construction, Inc.*, 118 S.W.3d 611, 614 (Mo. Ct. App. 2003).  However, "[w]here a corporation is used for an improper purpose and to perpetrate injustice by which it avoids its legal obligations, 'equity will step in, pierce the corporate veil and grant appropriate relief.'" *Irwin v. Bertelsmeyer*, 730 S.W.2d 302, 304 (Mo. Ct. App. 1987) (*Pasta House Co., v. Miller,* 691 S.W. 2d 460, 462 (Mo. Ct. App. 1985); *see also Camelot Carpets Ltd. v. Metro Distributing Co.*, 607 S.W. 2d 746, 749-50 (Mo. Ct. App. 1980)).

Missouri courts employ the instrumentality test and the alter ego test interchangeably when conducting an inquiry into whether the facts of a particular case merit veil piercing.  The instrumentality test requires that the plaintiff satisfy each of the following elements:

> 1. Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as

7

>    to this transaction had at the time no separate mind, will or existence of its own; and
>
>    2. Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
>
>    3. The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Fleming Companies, Inc. v. Rich*, 978 F. Supp. 1281, 1303 (E.D. Mo. 1997) (*Sansone v. Moseley*, 912 S.W.2d 666, 668-69 (Mo. Ct. App. 1995) citing *Collet v. American National Stores, Inc.*, 708 S.W. 2d 273, 284 (Mo. Ct. App. 1986)); *Sunbelt Environmental Services., Inc. v. Rieder's Jiffy Market, Inc.*, 138 S.W.3d 130, 136 (Mo. Ct. App. 2004).

Here, Zweifel seeks to pierce the corporate veil of PRC-MO in order to have his claims paid from the assets of its estate. PRC-MO is a subsidiary of PCI and the control requirement is not shown under the facts of this case. The control element is a critical component of the instrumentality test. Consequently, the instrumentality test is inapplicable.

Under the alter ego test, Missouri Courts employ a two part inquiry to decide when it is appropriate to pierce the corporate veil. Commensurate with this exercise, a plaintiff must satisfy two requirements to pierce the corporate veil. "[F]irst, the corporation must be controlled and influenced by persons or another corporation." *Home Insurance Co.*, 865 S.W.2d at 784 (*Terre Du Lac Association v. Terre Du Lac, Inc.*, 737 S.W. 2d 206, 218 (Mo. Ct. App. 1987)); *Gevers Heating & Air Conditioning Co. v. R. Webbe Co.*, 885 S.W.2d 771, 773-74 (Mo. Ct. App. 1994). "[S]econd, the evidence must establish that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong, or to perpetrate a fraud." *Id.*

The injury complained of must be proximately caused by the conduct of the corporation and those persons who control the corporation. *Id.* The alter ego test has been expanded under Missouri law to include the doctrine of reverse veil piercing in situations where the corporate form

is used by an individual to promote injustice. *See East Attucks Community Housing, Inc. v. Old Republic Surety Co.,* 114 S.W.3d 311, 322 (Mo. Ct. App. 2003) (holding that the alter ego rule applies in either piercing the corporate veil or reverse piercing of the corporate veil).

PCI is a holding company that performs no services or other functions for which it generates revenue as a separate entity. PCI is also the sole shareholder of PRC-MO which formerly owned and operated the *Admiral* as a casino business. PCI and PRC-MO shared virtually the same directors and officers from 1996 to 2002. Under this corporate structure, PCI directed the actions of PRC-MO to create revenues for PCI. Therefore, PCI controlled and influenced the operations of PRC-MO.

The remaining question involves whether Zweifel can establish that PCI used PRC-MO as a subterfuge to avoid repaying Zweifel under the terms of his contract with PCI. Upon the sale of virtually all of the assets of PRC-MO to Pinnacle, the PCI bankruptcy estate received merely $100,000.00 of the funds generated by the sale compared to the $31,500,000.00 allocated to the PRC-MO bankruptcy estate. This allocation of the assets between PCI and PRC-MO left PCI in a condition to repay only a fraction of its allowed claims whereas PRC-MO is in a condition to pay all of its allowed claims. This allocation of assets severely limits Zweifel's ability to be repaid the full severance for which he is entitled under the Letter Agreement.

Furthermore, Zweifel was treated as a full employee of PRC-MO for the remaining two years of his contract. The Form 10-K filings and Form W-2 wage and tax statements indicate that Zweifel was an employee of PRC-MO. Zweifel maintained his office and held the title of Executive Vice President and General Manager at PRC-MO from 2000 to 2002. Zweifel also did not participate in the management of PCI during his tenure at PRC-MO although he retained the title of Executive Vice President of PCI. Consequently, the Court finds that PCI used its corporate form to shield assets obtained from the Pinnacle sale from Zweifel under the evidence presented in this case. Therefore, Zweifel is entitled to reverse pierce the corporate veil of PRC-MO to have his claim paid

from its assets.

Debtors raise two arguments against allowing Zweifel's full severance claim against the PRC-MO estate instead of the PCI estate. First, Debtors argue that equity requires this Court to consider a 5-2 split of the obligations between PCI and PRC-MO, since Zweifel spent 5 years at the former and 2 years at the latter. Debtors fail to recognize by piercing the corporate veil, both PRC-MO and PCI are considered one entity such that allowing Zweifel's full claim against PRC-MO is appropriate under the facts of this case.

Second, Debtors argue that Zweifel should not be allowed to bypass the creditors of PCI to allow his claim to be paid by PRC-MO. Zweifel did not bypass any other creditors of PCI. Zweifel filed a claim in each bankruptcy estate in an attempt to have his full severance paid. It was inequitable for PRC-MO to hold Zweifel out as an employee, pay all of his other benefits yet refuse to pay his severance benefits. Theoretically, other creditors of PCI could have raised similar equitable claims prior to the expiration of the claims bar date. These other creditors failed to do so such that their claims will be paid by the remaining assets PCI's estate. Therefore,

**IT IS ORDERED THAT** President Riverboat Casino – Missouri, Inc.'s Objection to Claim is overruled in that James Zweifel is allowed an unsecured claim in the amount of $338,937.00, of which $4,650.00 is allowed as an unsecured priority claim for wages and contributions to an employee benefit plan.

_Kathy A. Surratt-States_
KATHY A. SURRATT-STATES
United States Bankruptcy Judge

DATED: September 14, 2007
St. Louis, Missouri

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

Mark V. Bossi
Brian W. Hockett
Thompson Coburn, LLP
1 U.S. Bank Plaza
St. Louis, MO 63101

John E. Hilton
120 S. Central, Ste. 1800
Clayton, MO 63105